# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

vs.

CHRISTOPHER OAKES,

Defendant.

CASE NO.: 20-CR-160-MKV

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

s/ Thomas D. Church
Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
Office:        404-223-3310
Facsimile:   404-223-3392
Email:        tom@patejohnson.com

s/ Page A. Pate
Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
Office:        404-223-3310
Facsimile:   404-223-3392
Email:        page@patejohnson.com

*Attorneys for Christopher Oakes*

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

Statement of Facts ..................................................................................................1

   1.  The First Search Warrant .............................................................................2

   2.  The Second Search Warrant.........................................................................7

Argument...................................................................................................10

   1.  The Affidavit for the First Search Warrant Failed to Establish Probable
      Cause and Recklessly or Intentionally Contained Material Omissions.......12

   2.  The Affidavit for the First Search Warrant Failed to Establish Probable
      Cause and Recklessly or Intentionally Contained Material Omissions.......20

   3.  The Government's failure to notify Mr. Oakes regarding the secret search
      of his barn for over a year violated Mr. Oakes' rights and warrants
      suppression...............................................................................................24

Conclusion................................................................................................30

# TABLE OF AUTHORITIES

Page

Cases

*Application for Search Warrant for e-mail Account*, 2013 WL 12291516, *5 (D.D.C. 2013) ...............................................................................................24, 26

*Franks v. Delaware*, 438 U.S. 154, 155, 156, 169, 171, 172 (1978) ....11, 12, 13, 21

*Illinois v. Gates,* 462 U.S. 213, 232, 238, 239 (1983).......................................10, 11

*United States v. Andrews*, 2008 WL 11396782 *4, *5, *6 (D. Kansas 2008).........27

*United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) .................................11

*United States v. Espinoza*, 2005 WL 3542519, *4 (E.D. Wash. 2005)...................27

*United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008).......................................11

*United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) .............................24

*United States v. Howard*, 489 F.3d 484, 496, 497 (2d Cir. 2007 ..........................27

*United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir. 1993)...............................29

*United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)......................11, 12

*United States v. Villegas*, 899 F.2d 1324, 1336, 1337, 1338 (2d Cir. 1990)....24, 25, 27, 29

Statutes and other Authorities

18 U.S.C. § 1343 ......................................................................................................2

18 U.S.C. § 1349 ......................................................................................................2

18 U.S.C. § 2705 ................................................................................................25, 26

18 U.S.C. § 3103a...........................................................................25, 26, 27, 28, 29

21 U.S.C. § 331 ..............................................................................................1

Federal Rules of Criminal Procedure, Rule 41 ..........................................25

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.2 ...........................3, 4, 15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.3 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.4 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.5 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.6 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.7 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.8 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.9 .................................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.10 ...............................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.11 ...............................15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.12 .......................3, 14, 15

N.Y. Comp. Codes R. & Regs. Title 9, § 4043.16 ...............................19

## I.   STATEMENT OF FACTS

Defendant Christopher Oakes ("Mr. Oakes") is charged in a superseding indictment with one felony count of conspiracy to violate the Food Drug and Cosmetic Act ("FDCA"). (Doc. 283). The indictment alleges that Mr. Oakes and others involved in the horseracing industry violated the FDCA by creating, distributing, and/or administering misbranded and adulterated performance-enhancing drugs ("PEDs") which were allegedly designed to improve the performance of racehorses and increase their chances of winning prize money.

Regarding Mr. Oakes' conduct specifically, the indictment alleges that Mr. Oakes violated 21 U.S.C. § 331 by 1) assisting co-defendant Navarro, a racehorse trainer, in obtaining, shipping, and administering misbranded and adulterated PEDs; 2) distributing misbranded and adulterated PEDs manufactured by co-defendant Dr. Fishman; and 3) creating and distributing his own misbranded PEDs.

During the investigation in this case, law enforcement obtained two search warrants for Mr. Oakes' barn and stable at 121 Bald Mountain Road, Bear Creek Township, Pennsylvania. The first warrant was issued on March 13, 2019 and authorized a "surreptitious search." Agents executed the warrant at midnight, sneaking onto Mr. Oakes' property and into his barn, where they seized medication and drew blood from two of Mr. Oakes' horses, "Rockstar Angel" and "Kotare Yarra." Mr. Oakes was not notified of the secret search until over a year later.

Law enforcement applied for a second search warrant in February 2020 and executed the warrant at Mr. Oakes' barn on March 9, 2020. During this search, law enforcement seized Mr. Oakes' electronic devices and other evidence. The affidavit accompanying the application for this warrant relied in part on the information from the prior affidavit, restating law enforcement's belief that Mr. Oakes was administering prohibited PEDs to his horses, but it omitted a key fact. **The Government received lab results confirming that the blood seized pursuant to the first warrant tested negative for any prohibited substances.**

1. The First Search Warrant

The first warrant issued for the barn at 121 Bald Mountain Road authorized a "blood draw" of two of Mr. Oakes' horses and the seizure of any "commercially-available equine products, performance-enhancing substances, and home-made substances" intended to be administered to horses. (Exhibit 1, First Search Warrant and Application, p. 29).[1] The warrant was limited to evidence of fraud under 18 U.S.C. §§ 1343 and 1349, alleging Mr. Oakes was involved in a "scheme to obtain, distribute, and administer various chemical substances to defraud racetracks, competitors, and the betting public by placing and racing horses in races after secretly administering prohibited substances to the racing horse." (Ex. 1, p. 6).

---

[1] Based on the protective order in place in this case, Mr. Oakes has not included the orders, affidavits, and other exhibits referenced in this motion in the public filing. We have submitted these exhibits to chambers for the Court's review.

The affidavit describes some of the relevant regulations under New York law governing the state's horseracing industry, including the rules against giving "prohibited substances" to racehorses. (Ex. 1, p. 10). The "New York Rules," as referenced in the affidavit, include a list of "prohibited substances" and ban "any other doping agents," defined as substances that have "a pharmacologic potential to alter materially the performance of a horse, had no generally accepted medical use in the horse when treated, and is capable at any time of causing an action or effect, or both, within one or more of the… mammalian body systems…but is not a substance that is considered to have no effect on the physiology of the horse except to improve nutrition or treat or prevent infections or parasite infestations." *Id*.

The affidavit omits key provisions of the New York Rules governing "prohibited substances and methods," however, including those expressly allowing the use of some "prohibited substances" for "restricted therapeutic use." Similarly, "other doping agents" may be used "pursuant to a valid therapeutic, evidence-based treatment plan." N.Y. Comp. Codes R. & Regs. Title 9, § 4043.12(a)-(c).

Critically, most substances under the New York Rules are only "prohibited" if administered to a horse within a certain amount of time before a race, such as omeprazole (24 hours before a race), arsenic and hormones (48 hours before a race), trichloromethiazide and ketamine hydrochloride (72 hours), and lidocaine (96 hours). N.Y. Comp. Codes R. & Regs. Title 9, § 4043.2. "No other drugs or

3

medications (including procaine) may be administered by any means within one week of the scheduled post time of the race in which the horse is to complete." *Id.* Other medications and supplements including antibiotics, antiseptics, vitamins, and electrolytes may be administered "at any time up to race time." *Id.*

Special Agent Timothy Bergen's affidavit sets forth several allegations in an effort to establish probable cause that Mr. Oakes was engaged in a fraudulent scheme to obtain, distribute, and manufacture "prohibited substances" for use in horseracing. The affidavit alleges that:

- In July and August 2018, racehorse trainer Nick Surick obtained Viagra from one of the government's confidential sources and gave it to his horses via nasogastric intubation, the administration of medication directly to the horse's stomach through a tube. (Ex. 1, p. 10-11). The affidavit refers to nasogastric intubation throughout only by its colloquialism, "drenching."

- At unidentified times, Surick "frequently discussed the administration of prohibited substances" with another trainer, Jorge Navarro. As an example, the affidavit describes intercepted calls concerning the use of a "shock machine." The affidavit alleges that New Jersey's horseracing regulations prohibit using a shock machine within 10 days of a race. (Ex. 1, p. 11).

- In December 2018, law enforcement obtained a blood sample from one of Surick's horses, which tested positive for a "prohibited substance" known as "epo." The affidavit states that "epo" is a "prohibited substance" under New Jersey's horseracing regulations. (Ex. 1, p. 13-14).

- On January 25, 2019, law enforcement intercepted a phone call between Mr. Oakes and Navarro regarding one of Navarro's horses that "ties-up" during races. The two men allegedly discussed whether Mr. Oakes could provide medication, such as "amino acid," that Navarro could administer to his horse via "drenching." Mr. Oakes allegedly told Navarro that he had a "drench" he

created that could be administered to Navarro's horse on race day and that there was "zero chance you get caught." (Ex. 1, p. 14-15).

As discussed below, the affidavit omits relevant information relating to this call. First, the race being discussed was held in Florida, not New York, so the New York Rules regarding "prohibited substances" would not have applied. (Exhibit 5, Session 7220). Additionally, in another segment of the call that is omitted from the affidavit, Mr. Oakes asked Navarro if he has a veterinarian available and to "ask the vet first" before Mr. Oakes made plans to bring the medication. (Exhibit 6, Session 6783).

- On February 10, 2019, law enforcement intercepted a call between Mr. Oakes and Navarro where they discussed a new product made by veterinarian Seth Fishman and whether Mr. Oakes could provide bottles of "acid" to Navarro. Mr. Oakes told Navarro that he knew a veterinarian who had some, and Navarro stated that he needed it the next day. The two also discussed a veterinarian in Louisiana who would not work with Navarro because of Navarro's apparent connection to Nick Surick, who the veterinarian would not "deal with." Navarro "falsely claimed to OAKES that NAVARRO has no dealings with "SURICK." (Ex. 1, p. 16-18).

As discussed below, the affidavit omits relevant portions of this intercepted phone call. During the call, Mr. Oakes told Navarro that, like the veterinarian in Louisiana, Mr. Oakes also refuses to interact with Surick or do business with him, describing Surick as "no good, "not a good guy," and "evil from top to bottom." (Exhibit 7, Session 13096).

- On February 19, 2021, law enforcement intercepted a phone call between Mr. Oakes and Dr. Fishman where Dr. Fishman asked whether Mr. Oakes had given Navarro some of Dr. Fishman's products. Mr. Oakes stated that he had not and that he had given Navarro "VO2 Max," which the affidavit describes as a medication that improves a horse's "ability to respirate." Mr. Oakes allegedly told Dr. Fishman that he took the label and cap off because he "didn't want [Navarro] to know." (Ex. 1, p. 18-19).

- On February 21, 2019, law enforcement intercepted a phone call between Mr. Oakes and Navarro where Navarro greets Mr. Oakes: "Rise and shine, baby, we got to drench, we got to drench, where are you at." The affidavit asserts that Mr. Oakes had previously provided Navarro a "mixture of

substances" that would not be detected in tests and alleges that this call reflects that Navarro was asking Mr. Oakes to provide this mixture of substances again. (Ex. 1, p. 19-20).

As discussed below, the affidavit omits the rest of this intercepted phone call between Mr. Oakes and Navarro. The full transcript of the call does not reflect that any actual "drenching" occurred or was specifically being planned for a later time. During the call, Mr. Oakes and Navarro say they will see each other later that day, but there is no discussion of administering any medication to any horses. Moreover, the call reflects that the race was not in New York, so the New York Rules regarding "prohibited substances" would not have applied. (Exhibit 8, Session 403).

The affidavit describes several other intercepted phone calls with Mr. Oakes in an attempt to establish probable cause that his barn would contain evidence of the alleged scheme involving "prohibited substances." (Ex. 1, p. 20).

- On March 10, 2019, law enforcement intercepted a call between Mr. Oakes and an unidentified person where Mr. Oakes discussed several "drenches" of medication he had stored in a "5 gallon bucket." Mr. Oakes asks this person to grab "5 of them" and "just put them on the front porch" or give them to his wife so she could "bring some of them down here." The affidavit alleges these were stored in Mr. Oakes' "Medicine Room" at the barn. (Ex. 1, p. 21).

- That same day, law enforcement intercepted a call between Mr. Oakes and another unidentified person where Mr. Oakes requested they grab "3 bottles of CMPK and three of the yellow, you know the amino…" and 30 pills from "a big bag of the bleeder pills." The affidavit states "bleeders" are "administered to horses in order to prevent their lungs from bleeding during a race." (Ex. 1, p. 21-22).

- The next day, March 11, law enforcement intercepted a call between Mr. Oakes and his wife regarding a race in Yonkers, New York on March 15, where Mr. Oakes had two horses racing, Rockstar Angel and Katari Yara. (Ex. 1, p. 19).

6

- That same day, Mr. Oakes called an unidentified male and suggested giving "blood shots" to Rockstar Angel and Katari Yara on March 13, 2019. Mr. Oakes allegedly stated that Katari Yara had never "had a drench, she has never had nothing," including any shots. Mr. Oakes and the caller also discussed giving Katari Yara pills and a drench. The affidavit contends that Mr. Oakes was discussing administering performance-enhancing drugs to Rockstar Angel and Katari Yarra and had already administered a drench to Rockstar Angel containing "prohibited substances." (Ex. 1, p. 23-24).

In requesting the blood draw from Mr. Oakes' horses, the affidavit contends there is probable cause to believe that the substances Mr. Oakes was administering to his horses were "prohibited substances" under the New York Rules and would thus provide evidence of the alleged wire fraud scheme. (Ex. 1, p. 25).

The affidavit also requested authorization to conduct a "covert search" and delay notification of the search for 30 days, which was granted, citing the ongoing investigation. (Ex. 1, p. 1, 26). Law enforcement received several extensions delaying notification of the search to Mr. Oakes (Exhibit 4, Extension Orders). Mr. Oakes was not notified of the search until after his arrest.

2. <u>The Second Search Warrant</u>

Roughly a year after law enforcement executed the first search warrant at Mr. Oakes' barn, agents applied for a second search warrant, which was executed on March 9, 2020. This warrant authorized the search and seizure of any evidence of wire fraud and manufacturing, distributing, or administering misbranded or adulterated drugs "relating to a scheme to obtain, distribute, and administer

adulterated and/or misbranded drugs in order to defraud racetracks by placing and racing horses in races after secretly administering such substances to the race horse." (Exhibit 2, Second Search Warrant and Application, p. 1-2).

In addition to repeating much of the information from the previous application and affidavit, Special Agent Robert Berntsson's affidavit adds that Mr. Oakes had been purchasing horse medications from Dr. Fishman's company, Esquestology, and was still in communication with Navarro in the time leading up to the second warrant. (Ex. 2, p. 6-7).

In an attempt to establish probable cause that Mr. Oakes was still engaged in criminal racehorse "doping" in 2020, and that evidence of such activity would be found at his barn, the affidavit alleges:

- In January 2019, law enforcement intercepted a phone call between Navarro and another target of the investigation, Michael Tannuzzo, regarding a "blood builder" for horses that is not detected when race officials "pull blood." Navarro allegedly stated that Mr. Oakes "loves" this product.  (Ex. 2, p. 9).

- After an intercepted call between Mr. Oakes and Navarro on January 25, 2019, where the two discussed providing medication for one of Navarro's horses, the affidavit states that several of Navarro's horses placed second, third, and fourth in various races two days later. (Ex. 2, p. 9-10).

- One of Navarro's horse, XY Jet, was scheduled to race on February 13, 2019, in Florida. On February 10, 2019, law enforcement intercepted a call between Navarro and Mr. Oakes where Navarro asked for "acid" and Mr. Oakes stated that he could get some from a veterinarian he uses. On February 11, 2019, law enforcement

intercepted a call between Mr. Oakes and Navarro where Mr. Oakes where Mr. Oakes said he had the product with him. Later that day, Navarro told his veterinarian that he wanted to give XY Jet the medication that Mr. Oakes had given him. (Ex. 2, p. 10-12). On February 13, 2019, the day of XY Jet's race, Navarro told Mr. Oakes to come to his barn and, if anyone stopped him, to tell them that he is an owner coming to Navarro's barn. (Ex. 2, p. 12).

- On February 18, 2019, law enforcement intercepted a phone call between Navarro and Zulueta regarding an "American" who made a "milkshake…that won't show up...the day of the race." Navarro discussed administering the medication through a drench. The affidavit contends that Mr. Oakes is the "American" referenced but provides no specific reason beyond the affiant's "participation in this investigation." (Ex. 2, p. 13).

- The affidavit also repeats the same information contained in the first affidavit regarding calls between Mr. Oakes and Navarro and Mr. Oakes and Dr. Fishman in February 2019. (Ex. 2, p. 11, 13-14).

- Dr. Fishman and Mr. Oakes were communicating through calls and texts from January 15, 2020, to February 19, 2020. (Ex. 2, p. 15).

- From July 2019 through October 2019, Mr. Oakes' barn had received multiple shipments from Dr. Shipman's business, and bank records reflect that Mr. Oakes had been purchasing medication from Dr. Fishman. (Ex. 2, p. 15-16).

- The affidavit describes the "surreptitious search" of Mr. Oakes barn in March 2019, alleging that law enforcement agents seized blood from two of Mr. Oakes' racehorses and "samples of PEDs," including allegedly adulterated and misbranded medications. (Ex. 2, p. 14-15).

The affidavit omits at least one key fact regarding the "surreptitious search" of Mr. Oakes' barn a year earlier. After that search, the Government sent samples of the blood seized from Mr. Oakes' horses to the Hong Kong Jockey Club

Laboratory, a world-renowned lab specializing in testing for prohibited substances in horseracing. **The blood tested negative for any "prohibited substances."**

## II.     ARGUMENT

The Fourth Amendment of the U.S. Constitution prohibits "unreasonable searches and seizures" and requires that "no warrants shall issue, but upon probable cause, supported by Oath." In determining whether "probable cause" exists to support a search warrant, the Supreme Court has explained that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). Nevertheless, a judge issuing a search warrant must consider the "totality of the circumstances" in determining whether, "given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238.

In reviewing a search warrant after its execution, the duty of a district court is to ensure that the issuing judge "had a substantial basis for concluding that probable cause existed." *Id*. at 238-39. It is insufficient to issue a warrant based simply on a "sworn statement of an affiant that he has cause to suspect and does believe" that a crime is being committed on certain premises. *Id*. at 239. The

issuing judge's actions "cannot be a mere ratification of the bare conclusions of others," and as such, "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id*. Accordingly, while some deference is due to the issuing judge, a district court should not hesitate to find that a search warrant is invalid because the issuing judge's "probable-cause determination reflected an improper analysis of the totality of circumstances." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008).

While the probable cause analysis is generally restricted to reviewing the search warrant and supporting application, a defendant is entitled to an evidentiary hearing and suppression of evidence obtained pursuant to the warrant if he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989), citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

The Second Circuit has held that *Franks also* applies to material omissions as well as false statements, and the relevant inquiry regarding material omissions is whether, "if the omitted material had been included in the affidavit, the affidavit would still establish probable cause…If it would not, we would be required to void the warrant and suppress the evidence seized pursuant to it." *United States v.*

*Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). To warrant an evidentiary hearing, a defendant need only offer a "suitable preliminary proffer of material falsity" and show that the affiant made the misrepresentations or omissions intentionally or with reckless disregard for the truth. *Franks*, 438 U.S. at 169, 171-72.

1. <u>The Affidavit for the First Search Warrant Failed to Establish Probable Cause and Recklessly or Intentionally Contained Material Omissions.</u>

The affidavit supporting the March 2019 search of Mr. Oakes' barn failed to establish probable cause that Mr. Oakes was committing a federal crime or that evidence of a federal crime would be found at his barn because the affidavit fails to establish probable cause that any of the medications described in the affidavit were "prohibited substances," a key element of the alleged wire fraud scheme. The affidavit also omits material information that would have further undermined the affidavit's basis for probable cause.

First, the affidavit attempts to connect Mr. Oakes to the alleged "doping" of racehorses by attempting to connect him to Nick Surick, a horse trainer who allegedly uses unlawful PEDs and whose horse tested positive for a "prohibited substance" under New Jersey regulations. (Ex. 1, p.13-14). The affidavit describes intercepted phone calls between Surick and Navarro, from over a year ago, wherein Navarro and Surick discuss giving horses Viagra and using a "shock machine." (Ex. 1, p. 10-11).

There is no indication in the affidavit that Mr. Oakes knew about Surick's horse testing positive for prohibited PEDs, however, or whether those PEDs would be "prohibited substances" under the New York Rules. There is no indication in the affidavit that Mr. Oakes knew about this "shock machine," ever used or possessed a similar device, or whether "shock machines" are prohibited under the New York Rules.[2] The affidavit attempts to tie Mr. Oakes to Surick only through their common association with Navarro. Not only is this connection too attenuated to weigh in favor of probable cause, but it is also undermined by the rest of the call, which the affidavit omitted. As reflected in a transcript of the full call, after Navarro told Mr. Oakes that a veterinarian in Louisiana would not do business with him based on his apparent ties to Surick, Mr. Oakes told Navarro that he also refuses to interact with Surick, who he described as "not a good guy." (Exhibit 7).

Given that the affidavit includes only the portions of this call that were more favorable to the Government, the omission of the rest of the call was clearly intentional, or at least made with reckless disregard for the truth. That Mr. Oakes refused to do business with Surick, a known user of "prohibited substances," is a material fact that cuts against a finding of probable cause that Mr. Oakes used or trafficked in those substances. As such, Mr. Oakes is entitled to a *Franks* hearing.

---

[2] Counsel notes that the affidavit also fails to establish that Navarro and Surick's use of a "shock machine" was "prohibited" since the affidavit does not indicate when it was used, and using "shock machine" is only prohibited within 10 days of a race under New Jersey regulations.

The alleged connection to Surick aside, the affidavit fails to establish probable cause because it fails to establish that Mr. Oakes was involved in the illegal use, distribution, or manufacturing of "prohibited substances" or "other doping agents." Since the New York Rules are the only regulations meaningfully discussed in the affidavit, any consideration of horseracing regulations in other states, including their definitions of "prohibited substances," would require improper speculation regarding information not included in the affidavit. The affidavit fails to establish that any of the substances discussed in the affidavit were "prohibited substances" under the New York Rules.

As reflected in the New York Rules, administering medications and supplements to racehorses is generally permissible even if the substance has the effect of improving the horse's performance in a later race. Depending on the substance, some medications and supplements can even be administered right before a race. Critically, the New York Rules only prohibit administering certain substances identified in a narrow list of "prohibited substances," or only at certain times before a race. The New York Rules also have various exceptions allowing the use of otherwise "prohibited substances," and they allow the use of "other doping agents" if they are used "pursuant to a valid therapeutic, evidence-based treatment plan." N.Y. Comp. Codes R. & Regs. Title 9, § 4043.12.

The affidavit not only omits these relevant provisions of the New York Rules, it ignores several operative definitions and exceptions and fails to distinguish between the legal acquisition and administration of medication and supplements for horses and alleged violations of racing regulations through the use of "prohibited substances" or "other doping agents." The affidavit establishes that Mr. Oakes was engaged in the former, but not the latter.

There is no allegation in the affidavit that Mr. Oakes was ever involved in handling or providing any medications or supplements considered "prohibited substances" under the New York Rules. The affidavit includes portions of intercepted calls where Mr. Oakes and others discussed medications such as "acid," "amino acids," and "VO2 Max," but the affidavit does not offer any information showing that these medications are "prohibited substances" or "other doping agents." N.Y. Comp. Codes R. & Regs. Title 9, §§ 4043.2 through 4043.12. Given the numerous exceptions and permissible uses of substances under the New York Rules, it is unreasonable to assume that all discussions regarding medication or supplements for racehorses involve discussion of "prohibited substances."

For example, in the February 2019 call between Mr. Oakes and Dr. Fishman discussing whether Mr. Oakes gave Navarro some of Dr. Fishman's product, there is no indication that this product was a "prohibited substance" in horseracing or was otherwise unlawful. The affidavit alleges that Mr. Oakes told Dr. Fishman that

he only gave Navarro "VO2 Max," but the affidavit does not suggest VO2 Max is a "prohibited substance," and VO2 Max is not listed as a "prohibited substance" under the New York Rules. (Ex. 1, p. 18-19). In fact, "VO2 Max" is simply the term for describing how much oxygen a human or animal body can absorb and use during exercise.[3] And even if Mr. Oakes and Dr. Fishman were discussing a supplement that is "designed to improve a horse's ability to respirate" during a race, it cannot be reasonably assumed that they were discussing a "prohibited substance." There are many similar supplements available in the commercial market that are not considered "prohibited substances."[4]

Similarly, there is no indication in the affidavit that Mr. Oakes was discussing a "prohibited substance" when he and Navarro discussed "block" and "acid" during an intercepted call in February 2019. (Ex. 1, p. 16-18). The affidavit asserts that "block" and "acid" are performance enhancing substances, but as discussed above, a medication is not illegal or a "prohibited substance" under the New York Rules simply because it has the potential effect of improving a horse's performance in a race. Additionally, the "acid" that Mr. Oakes referred to in this

---

[3] Everything to Know About VO2 Max. Healthline. Accessed. July 28, 2021. https://www.healthline.com/health/vo2-max.

[4] Air Max VO2. Equi-Herbs. https://www.equi-herbs.com/collections/equi-herbs-collection/products/air-max-vo2.

call was sold by a veterinarian that he knew, making it less likely that he thought it was a "prohibited substance" or otherwise unlawful. (Ex. 1, p. 16).

The affidavit attempts to cast Mr. Oakes' innocuous conduct as a racehorse owner and trainer in a more nefarious light by frequent reference to the informal terminology used by those in the horseracing industry to describe horse medications and their administration, such as "drenching."[5] But nasogastric intubation is an uncontroversial, let alone illegal, method of treating horses as well as administering "fluids, medications, nutritional gruel or supplements."[6] Equally uncontroversial is giving horses medication and supplements to protect their health, extend their lives, and keep them fit for races.

Likewise, the references to intercepted calls where Mr. Oakes directs others to pick up medicine from his barn, including "drenches," "CMPK," "blood shots," and "bleeder pills," do not provide any information indicating those medications were "prohibited substances" under the New York Rules. (Ex. 1, 21-24).

---

[5] In the intercepted call from February 21, 2019, for example, Navarro greets Mr. Oakes saying "We got to drench," but there is no indication of what exactly they would be administering, or whether the drench would involve "prohibited substances." Additionally, as noted above, the rest of the call was intentionally omitted from the affidavit and does not suggest there was an actual plan to administer medication to Navarro's horses that day. (Exhibit 6).

[6] Alfredo Sanchez Londoño. Manual of Clinical Procedures in the Horse. Nasogastric Intubation. November 10, 2017. https://onlinelibrary.wiley.com/doi/abs/10.1002/9781118939956.ch14.

There is also no indication of when Mr. Oakes intended to use these medications, such as within a prohibited timeframe before a race. There is no indication in the affidavit that these substances were on any list of "prohibited substances" or illegal PEDs. In fact, many of them are widely used by horse owners and are available on the commercial market.[7] There is nothing in the affidavit suggesting that Mr. Oakes was doing anything illegal or prohibited by storing horse medications and supplements to use at later, unspecified dates and times. In fact, this would be expected from a horse owner and trainer.

Based on these intercepted calls, the contends Mr. Oakes was administering "prohibited substances" to two of his horses, Rockstar Angel and Katari Yara, and that he had already administered "prohibited substances" to Rockstar Angel. Not only are these contentions wholly conclusory, but, as reflected in the lab results discussed below, they turned out to be wrong. These results highlight that horses can be administered several supplements and medications that are not "prohibited."

The Government will likely point to an intercepted call between Mr. Oakes and Navarro in January 2019 regarding one of Navarro's horses that "ties-up" in

---

[7] Oxy-Gen Bleeder Daily Equine Cellular Health Supplement. Riding Warehouse. https://www.ridingwarehouse.com/Oxy-Gen_Bleeder_Daily_Equine_Cellular_Health_Supplement/descpage-OBLE.html?from=gshop&gclid=EAIaIQobChMI_cfGqvuF8gIV9RCzAB2wgQs2EAQYAyABEgK-jfD_BwE; PRN High Potency CMPK Drench Plus Gallon. Big Dee's Tack & Vet Supplies. https://www.bigdweb.com/product/code/18699.do?gclid=EAIaIQobChMI07y77fuF8gIVKfLjBx055gv-EAQYASABEgIRv_D_BwE; Calcium Dextrose CMPK. Heartland Veterinary Supply and Pharmacy. https://www.heartlandvetsupply.com/p-3551-calcium-dextrose-cmpk.aspx.

races and Mr. Oakes' statements that he could provide a medication that could be administered via "drenching" with "zero chance you get caught." (Ex. 1, p. 14-15).

Critically, however, the race in question was in Florida, not New York, so the New York Rules are irrelevant, and the affidavit does not specify what Florida regulations, if any, would have been violated by administering this medication on race day. (Exhibit 5). There is no indication in the affidavit that the medication at issue was illegal or a "prohibited substance." In fact, "amino acid" is a commonly used supplement and is widely available on the commercial market, including from retailers like Walmart and Purina.[8]

Significantly, and omitted from the affidavit, the rest of the intercepted call reflects that Mr. Oakes also asked Navarro to "ask the vet first" and see if the veterinarian was available before Mr. Oakes would bring the medication. (Exhibit 6). While this race was in Florida, the New York Rules require that a veterinarian provide a recommendation before an owner can administer medications." N.Y. Comp. Codes R. & Regs. Title 9, § 4043.16. As such, Mr. Oakes' concern regarding the availability of Mr. Navarro's veterinarian reflects a lack of criminal intent on his part.

---

[8] Amino Acid Concentrate. Walmart. https://www.walmart.com/ip/Amino-Acid-Concentrate-AgriLabs/311267193?wmlspartner=wlpa&selectedSellerId=101041927; Purina Supersport Amino Acid Supplement. Purina. https://shop.purinamills.com/products/purina%C2%AE-supersport%C2%AE-amino-acid-supplement?variant=40043781554331.

2.  <u>The Affidavit for the Second Search Warrant Failed to Establish Probable
    Cause and Recklessly or Intentionally Contained Material Omissions.</u>

The affidavit supporting the second search warrant of Mr. Oakes' barn also

failed to establish probable cause that Mr. Oakes was engaged in criminal activity

or that evidence of a crime would be found at his barn. It also contains material

omissions that undermine the issuing judge's finding of probable cause.

The affidavit for the second warrant repeats much of the same information

from the search warrant, it includes descriptions of additional intercepted calls, and

it references the "surreptitious search" of Mr. Oakes' barn a year ago, where the

affidavit states law enforcement drew blood from two of Mr. Oakes' horses and

seized several medications. (Ex. 2, p. 14-15).

Notably, however, the affidavit does not include the test results for the blood

seized from Mr. Oakes' horses. The omission is all the more glaring because the

purpose of the first search warrant was to obtain evidence that Mr. Oakes used,

distributed, and created "prohibited substances" for racehorses. **The affidavit

intentionally omits that the blood samples pursuant to the first warrant were

tested and found to contain no prohibited substances. (Exhibit 3, Lab Results).**

Including this key information in the affidavit would have significantly

undercut any basis for finding probable cause. As discussed at length above,

neither of the affidavits specifically identified the "prohibited substances" or PEDs

that Mr. Oakes allegedly used or created. The New York Rules referenced in the

first affidavit reflect that many medications and supplements can be administered to horses leading up to their races, and there are exceptions even for substances that are "prohibited." Both affidavits ignore the distinction between permissible medications and supplements and prohibited PEDs in horse racing. The omitted lab results emphasize that distinction and undermine any basis for probable cause.

To warrant a *Franks* hearing, Mr. Oakes must sufficiently allege that this material omission was made intentionally or with reckless disregard for the truth. The exculpatory value of these lab results is hard to ignore, but that is precisely what the affiant did when he referenced the March 2019 search of Mr. Oakes' barn, noted that law enforcement drew blood from horses suspected of receiving PEDs, but then omitted the fact that the blood samples tested negative for any "prohibited substances." At a minimum, the omission of this important information reflects a reckless disregard for the truth based on its materiality and significance in determining whether there was probable cause.

Notwithstanding the material omission of the lab results, the affidavit still fails to establish probable cause. The affidavit relies on conclusory statements that law enforcement agents saw, but did not seize, misbranded and adulterated PEDs when they searched Mr. Oakes' barn in 2019, but the affidavit does not offer a physical description of these alleged PEDs or any other information indicative of misbranding or adulteration. (Ex. 2, p. 24-26).

21

The affidavit also emphasizes that Mr. Oakes and Dr. Fishman were still in communication at the time leading up to the application for the second warrant and that records reflected that Mr. Oakes had purchased multiple shipments of products from Dr. Fishman's business and received them at his barn. (Ex. 2, p. 15-16). The affidavit relies on conclusory statements that the products Mr. Oakes purchased from Dr. Fishman were misbranded and adulterated but offers no support for that contention. From Mr. Oakes' perspective, the fact that he was purchasing these products from a licensed veterinarian suggested, at least to him, that they were not misbranded or adulterated. There is nothing nefarious or suspicious about a horse owner purchasing medication and supplements for his or her horses from a vet.

Like the first affidavit, the second affidavit also relies on an intercepted calls between Mr. Oakes and Navarro from 2019, such as the call on January 25, 2019, where Navarro discussed one of his horses "tying-up." The affidavit notes that several of Navarro's horses performed well in races two days later. (Ex. 2, p. 9-10). However, the affidavit does not offer any indication of what these substances were, whether they were "prohibited substances" under certain state regulations, whether they were misbranded or adulterated, or whether any of the horses that won were the horse Navarro was referring to in his call with Mr. Oakes.

The affidavit also relies on statements allegedly made by Navarro about Mr. Oakes, such as an intercepted call from early 2019 where Navarro described a

"blood builder" for horses that was allegedly not detectable by race officials and which Mr. Oakes allegedly "loves." (Ex. 2). In another call, Navarro refers to an "American" who makes a "milkshake…that won't show up…the day of the race." (Ex. 2). The affidavit contends this "American" is Mr. Oakes, but it offers no specific reason beyond Agent Berntsson's "participation in the investigation." Aside from failing to establish that the unidentified "American" was Mr. Oakes, there is no indication that the "blood builder" or "milkshake" at issue are "prohibited substances" or are misbranded or adulterated drugs. Nor should the court credit the uncorroborated hearsay from Navarro.

The affidavit focuses on intercepted conversations regarding Navarro's horse, XY Jet, two days before a scheduled race on February 13, 2019. The affidavit asserts that Mr. Oakes and Navarro spoke on a phone call wherein Mr. Oakes said he had "that thing in my pocket," and the two men agreed to meet. (Ex. 2, p. 12). Navarro later called Gregory Skelton, his veterinarian, that he received a medication from Mr. Oakes and wanted to give it to XY Jet. (Ex. 2, p. 12). On the day of the race, an intercepted call between Navarro and Mr. Oakes reflects that Navarro told Mr. Oakes to come to his barn and to tell people he was an owner if anyone stopped him. (Ex. 2, p.12-13).

Again, however, the affidavit fails to provide any information or indication suggesting that the medications or supplements discussed in these calls are

"prohibited substances" under any horseracing regulations or that they are

misbranded or adulterated. In fact, the involvement of Navarro's veterinarian cuts

against finding that these substances were "prohibited" or misbranded substances.

Finally, Mr. Oakes contends that the information reflected in calls from early

2019 was not "sufficiently close in time to the issuance of the warrant," and this

information had grown stale by March 2020. *United States v. Raymonda*, 780 F.3d

105, 114 (2d Cir. 2015), probable cause must "exist as of the time of the search."

3. <u>The Government's failure to notify Mr. Oakes regarding the secret search of his barn for over a year violated Mr. Oakes' rights and warrants suppression.</u>

It is well-established that a person is entitled to notice when the Government

searches their property pursuant to a search warrant, especially when the search is

conducted secretly and without the property owner's knowledge. *See United States

v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986), holding the Fourth Amendment

"demands that surreptitious entries be closely circumscribed"; *Application for

Search Warrant for e-mail Account*, 2013 WL 12291516, *5 (D.D.C. 2013), "It

can be said with confidence that Congress has never indicated that it considers the

giving of notice as a mere formality."

Under limited circumstances, the Second Circuit has held that the

Government can delay providing notice to a defendant of a covert search of their

property. *See United States v. Villegas*, 899 F.2d 1324, 1336-38 (2d Cir. 1990). In

*Villegas*, the Second Circuit held that delaying notice of covert searches is only

permissible if the officers "have made a showing of reasonable necessity for the delay" and the delay is only for "a reasonable time after the covert entry." *Id*.

Under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3103a, a judge issuing a search warrant can authorize delayed notice by up to 30 days after the execution of the warrant only if: 1) "the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result"; 2) "the warrant prohibits the seizure of any tangible property…except where the court finds reasonable necessity for the seizure" and 3) "the warrant provides for the giving of such notice within a reasonable period not to exceed 30 days after the date of its execution, or on a later date certain if the facts of the case justify a longer period of delay."

Here, both Rule 41 and Mr. Oakes' Fourth Amendment rights were violated. Notwithstanding the lack of probable cause for the covert search of Mr. Oakes' barn, the first search warrant was also defective in that the issuing judge only cited 18 U.S.C. § 2705, not § 3103a, in authorizing delayed notice. (Ex. 1, p. 1). This is notable because § 2705, which only applies to court orders requiring computing service providers to disclose electronic records under § 2703(b), broadly authorizes delayed notice if the court finds "reason to believe that notification of the existence of the court order may have an adverse result." 18 U.S.C. 2705(a)(A).

In contrast, § 3103a requires three specific things: reasonable cause to believe notification may have an adverse result, a limitation of 30 days for the initial delay, and, most relevantly here, "the warrant prohibits the seizure of any tangible property…except where the court finds reasonable necessity for the seizure." *See Application*, 2013 WL 12291516 at *5, "the legislative history makes clear that changes were made to ensure that, when utilizing the so-called sneak-and-peek warrant under 18 U.S.C. § 3103a, the government was prohibited from seizing any wire or electronic communication…without a showing of reasonable necessity, *and* that notice of the search of the same be given within a reasonable time of the execution of the warrant."

In authorizing the initial delayed notice for 30 days, the issuing judge only made a finding that there could be an adverse result under § 2705. The text of § 3103a is clear, however, and only allows delayed notice of a search warrant if "the warrant prohibits the seizure of any tangible property." Here, the warrant expressly authorizes the seizure of Mr. Oakes' tangible property. The issuing judge did not make any findings regarding the necessity for the seizure.

This is a significant omission because the Second Circuit has distinguished between searches for tangible evidence, such as contraband or documents, and searches "where the entry is to be covert and only intangible evidence is to be seized," recognizing that "a covert entry search for intangibles is less intrusive than

26

a conventional search with physical seizure because the latter deprives the owner not only of privacy but also of the use of his property." *Villegas*, 899 F.2d at 1336; *see also United States v. Howard*, 489 F.3d 484, 496-97 (2d Cir. 2007), "Under normal circumstances the seizure of tangible property might make a search 'more egregious' than a search that only results in the seizure of intangibles.

Accordingly, the initial delay in providing notice to Mr. Oakes regarding the secret search of his barn violated Mr. Oakes' rights, and warrants suppression, because the judge issuing the warrant for the search improperly authorized a covert search and seizure of Mr. Oakes' tangible property without making the required finding of necessity. *See United States v. Espinoza*, 2005 WL 3542519, *4 (E.D. Wash. 2005), the failure of issuing judge to make required findings for authorizing delayed notice of physical seizure under § 3103a warranted suppression; *United States v. Andrews*, 2008 WL 11396782 *4-6 (D. Kansas 2008), holding warrant was defective, and suppression warranted, where court authorized delayed notice for seizure of tangible evidence without making required findings of necessity.

After the execution of the warrant and the initial delay, the Government sought and obtained four 90-day extensions, on April 11, 2019, June 10, 2019, October 8, 2019, and January 3, 2019, authorizing the Government to withhold notice to Mr. Oakes for over a year. (Exhibit 4). As with the order authorizing the initial delay, none of the extension orders reference the requirement that a court

find "reasonably necessity for the seizure" when a warrant allows the covert seizure of tangible property, let alone make that finding. As such, the extension orders are similarly defective and invalid.

Suppression is also warranted because the initial application for delayed notice and the subsequent applications for 90-day extensions relied on the same, conclusory language and failed to provide a particularized or "updated" showing of necessity for withholding notice from Mr. Oakes.

In the initial application for an extension, the Government offers only a single paragraph contending that immediate notification would compromise the investigation "by notifying subjects and targets of the investigation's existence and of the existence of other, related investigations, in other jurisdictions. Notification of the execution of the warrant also would disclose the existence of confidential sources, thus jeopardizing their safety." (Ex. 1, p. 36).

The subsequent applications for extensions are nearly identical, arguing in conclusory fashion that delayed notice was still necessary because the investigation "remains ongoing," and notification could result in targets of the investigation destroying evidence, changing patterns of behavior, notifying other targets, and fleeing prosecution.  (Ex. 4, p. 10, 14-15).

The failure to meet the requirements of 18 U.S.C. § 3103a aside, it was unreasonable for the Government to continue withholding notice of their covert

search of Mr. Oakes' barn for over a year. "What constitutes a reasonable time will depend on the circumstances of each individual case," though the Second Circuit has counseled that a delay should not exceed 7 days absent "good cause," and "extensions should not be granted solely on the basis of the grounds presented for the first delay; rather, the applicant should be required to make a fresh showing of the need for further delay." *Villegas*, 899 F.2d at 1337. Under § 3103a(c), a court may extend delayed notice by up to 90 days at a time, "for good cause shown, subject to the condition that extensions should only be granted upon an updated showing of the need for further delay."

Here, the delay of over a year in this case was unreasonable under the circumstances. First, agents seized Mr. Oakes' physical property, making the search in question far more intrusive than the typical "covert entry searches" that the Second Circuit has characterized as "less intrusive." *United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir. 1993), citing *Villegas*, 899 F.2d at 1337.

The FBI executed a secret search of Mr. Oakes' barn in the dead of night, seizing several medications and drawing blood from two of his horses, and did not notify Mr. Oakes for over a year. This delay was not properly authorized, since covert search warrants do not authorize the physical seizure of tangible evidence absent a specific finding of necessity, and it was an unreasonably long delay. Under these circumstances, Mr. Oakes' Fourth Amendment rights were violated.

Finally, while law enforcement obtained judicial orders authorizing this delay, the Government also omitted key information from their applications for those extensions—namely that the substances they sought to seize pursuant to the first search warrant had tested negative for "prohibited substances."

The main purpose for the first search warrant was to authorize the Government to take blood from Mr. Oakes' horses to prove he was giving his horses prohibited PEDs and was involved in a criminal "doping" scheme. Even after receiving these test results, however, the Government continued seeking to keep its search of Mr. Oakes' barn, and the exculpatory evidence it seized there, a secret from Mr. Oakes. In doing so, it also withheld that evidence from the courts. In determining whether to continue delaying Mr. Oakes' right to be notified of the secret search at his barn, the courts should have been able to consider that fact.

## CONCLUSION

For these reasons, Mr. Oakes respectfully requests that the Court hold an evidentiary hearing on this motion and suppress any and all evidence unlawfully obtained by law enforcement pursuant to the above-referenced search warrants and any fruits of those unlawful searches.

DATED: July 29, 2021.

Respectfully submitted,

s/ Thomas D. Church
Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
Office:        404-223-3310
Facsimile:   404-223-3392
Email:        tom@patejohnson.com

s/ Page A. Pate
Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
Office:        404-223-3310
Facsimile:   404-223-3392
Email:        page@patejohnson.com

*Attorneys for Christopher Oakes*