

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 24, 2022

**VIA ECF & E-MAIL**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Christopher Oakes</u>, S11 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

      Christopher Oakes was a prominent racehorse trainer whose success, like that of his co-defendants in this case, was founded on fraud and animal abuse. Oakes built his racing program on a scheme to obtain and administer illegal, unsafe, untested, and intentionally untestable performance enhancing drugs ("PEDs") to racehorses under his control, and participated in the schemes of others – notably, Jorge Navarro – to accomplish the same for their programs. Although the evidence developed against Oakes was, relative to others in these cases, limited in temporal scope, his efforts to corrupt his "sport" were profound throughout that time, as reflected in the parties' stipulated Guidelines calculation. Oakes participated in doping races worth over $1,500,000 in the course of the charged period; accomplished that fraud by obtaining and abusing PEDs from multiple sources; and contributed to others' fraudulent doping programs by providing PEDs to other corrupt trainers, including Jorge Navarro. The parties' stipulated Guidelines sentence of 36 months is the appropriate sentence in this case.[1]

    **I.**    **<u>Offense Conduct</u>**

      Oakes earned over a million dollars in purse winnings by training and racing horses that he had "doped" using a plethora of adulterated and misbranded performance-enhancing drugs ("PEDs"), including (among others) blood builders, vasodilators, "drenches," "bleeder" pills, and other drugs not approved by the Food and Drug Administration ("FDA"). Oakes was also willing

---

[1] Pursuant to the parties' plea agreement, Oakes has agreed to forfeit a total of $62,821, which represents the value of the adulterated and misbranded drugs the defendant illicitly obtained and administered to racehorses. The court has previously approved the parties' consent preliminary order of forfeiture (ECF No. 541), and the Government requests only that the Court's oral pronouncement of sentence include the amount of the forfeiture money judgment previously agreed.

to engage in surreptitious delivery of drugs to notorious doper, Jorge "Juice Man" Navarro. As with each of the defendants charged in this case, Oakes' means of evading detection of his unlawful scheme included: the use of drugs that Oakes believed would be untestable by racing officials; and the coordination of the administration of those drugs with other trainers and veterinarians to avoid physical detection by racetrack employees and racing authorities.

In the course of this investigation, and as described in part at the recent trial of Oakes' co-conspirator Seth Fishman, Oakes maintained a small pharmacy's worth of drugs at his barn in Pennsylvania. Those included misbranded and adulterated blood builders, growth factors, and pain shots obtained from Fishman and Oakes. A sampling of those drugs are pictured in the exhibits included as Exhibits C through J, attached hereto.

Oakes also provided Navarro with a novel and untestable "drench" designed by Oakes for race-day administration, *see* Exhibit A at 6 (referring to Oakes "drench"); Exhibit B at 6-7 (same). In this capacity, Oakes assisted in the doping of "XY Jet," a horse under Navarro's care. Navarro endeavored to dope "XY Jet" in advance of a February 13, 2019 precursor race to the $2.5 million Golden Shaheen race, including through coordination of the surreptitious delivery of drugs by Oakes. "XY Jet," a seven-year-old racehorse at the time of the Allowance Optional Claiming race at Gulfstream Park on February 13, 2019, had undergone knee surgery three separate times prior to that race.[2] As previously described in the Government's sentencing memorandum in advance of the sentencing of Navarro, on February 9, 2019, Navarro had implored co-conspirator Marcos Zulueta for help in doping the horse, and secured Zulueta's promise to send a bottle of "blocker" "overnight" to ensure that Navarro received it before the race. Navarro, despite Zulueta's assurance that Zulueta would send the drug, then called Oakes the next day to discuss doping "XY Jet," and to discuss the administration of a baking soda "drench" to "XY Jet," including on the day of the race, to ensure that "XY Jet" could perform notwithstanding the physical toll that Navarro's program had already placed on the horse.

Two days before the race, on February 11, 2019, Navarro and Zulueta discussed the fact that "XY Jet" had tied up, and Zulueta discouraged Navarro from racing the horse that day. Navarro brushed those concerns aside and detailed what he had given, and planned to give, to "XY Jet" to ensure he could race, stating that he had given that horse a serum, baking soda, and planned to inject the horse with the "blocker" they had discussed earlier. Later that day, Navarro and Oakes arranged to meet in person, after Oakes had confirmed that he "got that thing," *i.e.*, the bottle of "blocker." Exhibit K. Navarro, intent on ensuring that he received the drugs he believed were necessary to compel "XY Jet" to race, called Gregory Skelton and made plain why he was going to such lengths to prop up "XY Jet," stating: "I got the nice horse XY Jet that he has gone through three knee surgeries . . . *I wanted to do him with that today* so Chris got it for me." *Id.*

The morning of February 13, 2019—the day of XY Jet's race, when Navarro expected to drench the horse—Navarro expressed to Zulueta his desire "to know how to tube, buddy. I would

---

[2] *See* Michaele MacDonald, *Three Times Under the Surgeon's Knife – but XY Jet may be better than ever now*, Thoroughbred Daily News, March 28, 2018, https://www.thoroughbredracing.com/articles/three-times-under-surgeons-knife-xy-jet-may-be-better-ever-now/.

tube all my horse[s]." Ex. L. Zulueta attempted to dissuade Navarro from "tubing," stating, "you have to be fucking—fucking careful. I tried—I tried to do that and I almost killed the horse—the horse, man. It went to the lungs," to which Navarro responded, simply, "Yes." Ex. L at 7. Far from expressing trepidation at the notion of drenching "XY Jet" following Zulueta's warnings of what could go wrong if done incorrectly, Navarro later spoke with Oakes to ensure that Oakes was meeting Navarro at the barn for the purpose of doping the horse: "Drive right through if anything. If they stop you, you are an owner and you come to Navarro's barn." Ex. M. "XY Jet" raced later that day, placing first and winning a purse of $31,900. On March 30, 2019, "XY Jet" placed first at the Golden Shaheen, despite losing a shoe in the middle of the race.

## II. Procedural History

On February 26, 2020, a federal grand jury sitting in the Southern District of New York returned an Indictment charging 19 individuals, including the defendant, with engaging in various conspiracies to manufacture, distribute, administer, and/or receive adulterated and misbranded PEDs intended for use on racehorses, and to secretly administer those PEDs to racehorses under scheme participants' control, with the intent to mislead and defraud various people and entities, including federal and state drug and horse racing regulators. *United States v. Navarro et al.*, 20 Cr. 160 (MKV) (S.D.N.Y.). Oakes was charged in one count of participating in the Navarro doping program, *i.e.*, Count One.

On October 20, 2021, Oakes pleaded guilty, pursuant to a plea agreement, to Count One of the S11 Superseding Information, charging Oakes with one count of substantive drug misbranding and adulteration with intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331 and 333. Oakes' change of plea followed his filing of a motion to suppress evidence of his guilt, and following the Government's response in opposition to that motion, but prior to the Court's announcement of the denial of pretrial motions for suppression on November 4, 2021. ECF No. 567.

Under the terms of the parties' agreement, Oakes stipulated that: the applicable loss amount is greater than $1,500,000, but less than $3,500,000 (based on Oakes' horses' purse winnings during the relevant time period); the offense involved at least 10 victims (calculated on the basis of the racetracks that made payments based on Oakes' doped horses' performances); and that Oakes abused a position of public and private trust, namely his status as a licensed horse trainer. As reflected in the parties' plea agreement, the ultimate Guidelines sentence is "capped" by the applicable statutory maximum term of imprisonment: 36 months.

### A. Sentencing Factors

#### a. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

Although he has pleaded guilty and accepted responsibility for his offense, Oakes plainly misapprehends the seriousness of his offense. While repeatedly referring to his use of "supplements" – a category that, even were it to exist in the context of animal feed and drugs, certainly does not encompass the unlabeled, untested, unstable, *injectable* drugs that Oakes favored – Oakes glibly claims that he never abused or intended to abuse an animal for money. That is false. Oakes purchased small vials of injectable drugs from manufacturers like Seth Fishman without regard to the actual content or likely long-term effects of those drugs in the body of the horses under Oakes' control. He stored those drugs in his barn, injecting them for the purpose of committing fraud. And he did so over an extended period. Because there was no reason for this course of conduct other than to force his horses' bodies to conform to an unnatural level of performance in furtherance of a fraud, Oakes was, indeed, involved in the abuse of his animals for money.

This offense conduct was consistent with Oakes' overall approach to his "sport." Oakes provided drugs to others, like the notoriously corrupt Jorge Navarro. Although Oakes' sentencing submission refers frequently to his family, Oakes in fact encouraged others, including his own family member, to race doped horses, directing that he inject "epogen" and a "blood shot" to a particular horse running in Pennsylvania in late March of 2019. Ex. N; *see also* Ex. O.

Oakes also engaged in efforts to hide his participation and ownership of certain horses, again choosing misdirection over transparency in the conduct of his affairs, with the effect of

Case 1:20-cr-00160-MKV   Document 790   Filed 02/24/22   Page 5 of 8

Page 5

ensuring that investigation of the relevant horses would not "come back" to Oakes. That plot was literally spelled out in a series of documents obtained from Oakes' property, and reflect explicit intent by Oakes and others, including individuals who submitted letters on Oakes' behalf in this case, to obscure the scope of Oakes' activity in horse racing. *See* Ex. P (series of invoices, false bills for "jogging equipment," and notes explaining the scheme (*e.g.*, at page 32, "C. Oakes will send the Bill for equipment so Northfork [*i.e.*, Oakes shell company] doesn't show up anywhere.")); *id*. at 17 ("50% Pompey (IN HIS NAME 100%)"); *see also* Ex. Q (file folder labeled: "For our eyes only. Horses claimed in Chuck's name but we own ½ of. Shared purse pd [paid] to C. Oakes fake invoices & cashed checks."); *id*. at 2 ("Claimers that are 100% in Chuck's name. Check receives all bills showing 100% owned. C.O. Racing will send Chuck an invoice. Chuck pays C.O.R. so there is no paper trail to Northfork."). This shell game that Oakes played with "Northfork" was, in part, designed to conceal the extent of his doping program. In a recorded call with Seth Fishman, Oakes described this aspect of his company's structure directly: "SF: But you didn't want anything in your name, remember? / CO: Well, well that's right. That's why it's going to Northfork."). *See* Ex. R at 3 (GX 131A-T from the trial of Seth Fishman).

As the Court is aware, the Government has carefully considered its view of the relative culpability of the defendants who have pled guilty thus far, keeping in mind the culpability of those defendants who have yet to reach any disposition in this case, and has endeavored to reach dispositions with Guidelines calculations that accurately and appropriately reflect the defendants' individual offense conduct and personal characteristics, their culpability relative to one another, as well as the quality of their acceptance of responsibility relative to the timing of their decisions to plead guilty. The defendants who have pleaded guilty thus far in this matter and their stipulated Guidelines ranges are listed below. This summary is provided for the Court's reference, but it of course does not capture the totality of the relevant considerations for each defendant.

- Jordan Fishman (Guidelines Range of 12 to 18 months' imprisonment): Jordan Fishman, a drug manufacturer, assisted Seth Fishman in creating and manufacturing adulterated and misbranded performance-enhancing drugs in his Massachusetts-based laboratory, for further distribution by Seth Fishman and Seth Fishman's sales representative, Lisa Giannelli. Jordan Fishman personally produced the illegal drugs for later distribution, created new drugs entirely at Seth Fishman's direction, and was involved in the manufacture of a variety of drugs. Jordan Fishman was not involved in the labeling, marketing, or sale (to consumers) of the illicit drugs he created, nor did he solicit customers or otherwise engage with customers, and did not otherwise promote the drugs that he created and produced. Unlike Oakes, Jordan Fishman did not have any animals under his care and/or control, did not capitalize on that position to conceal the administration of drugs to racehorses, did not engage in the use of sham entities to hide his criminal activity, and did not direct others (including family members) to engage in criminal activity. On February 8, 2022, this Court sentenced Jordan Fishman to a term of fifteen months' imprisonment, and one year of supervised release.

- Michael Kegley Jr. (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence was correspondingly adjusted to 30 to 36 months' imprisonment):  Kegley, the Director of Sales of Medivet, unlike Oakes, held no professional license, and did not have direct access to racehorses as part of his profession. Likewise, unlike Oakes, Kegley did not engage in efforts to generate fraudulent invoices in order to conceal his ownership of horses, and did not use sham companies to conceal his purchases of adulterated and misbranded PEDs.  Although Kegley claimed in a consensually recorded call to be aware that veterinarians engaged in false billing practices, he did not personally engage in this practice, nor was he in a position to facilitate that practice.  Further, while Oakes was involved in receiving multiple adulterated and misbranded drugs, including particularly potent varieties marketed by Seth Fishman, Kegley's criminal activity was predominantly confined to the distribution of a discrete set of adulterated and misbranded drugs. On January 6, 2022, this Court sentenced Kegley to a term of thirty months' imprisonment, and one year of supervised release.

- Marcos Zulueta (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Range is correspondingly adjusted to 30 to 36 months' imprisonment): Zulueta, a racehorse trainer, also assisted Navarro in obtaining and administering performance-enhancing drugs for the purpose of doping horses, and exchanged tips with Navarro regarding new illicit drugs to administer to horses, and methods of administration – similar to Oakes.  Like Oakes, Zulueta not only procured illicit drugs, he personally administered them to the racehorses under his care and control. Also like Oakes, although Zulueta, like Navarro and other trainers, stood to personally profit from the improved performance of the racehorses he doped, Zulueta-trained racehorses (and, by extension, Zulueta) earned comparatively less in purse winnings than Navarro, and over the course of the conspiracy, Zulueta raced fewer racehorses than Navarro. On February 24, 2022, this Court sentenced Zulueta to a term of 33 months' imprisonment, and one year of supervised release. It is the Government's view that Zulueta and Oakes are roughly equivalent in terms of their culpability.

- Kristian Rhein (Guidelines Range of 135 to 168 months' but, given the statutorily authorized maximum sentence, the Guidelines Sentence is correspondingly adjusted to 36 months' imprisonment):  Rhein was a veterinarian and Medivet-affiliate who conspired with Kegley and others to market, distribute, sell, and administer SGF-1000, and further illicitly distributed unprescribed clenbuterol. Rhein was a licensed veterinarian who predominantly treated racehorses; as such, Rhein – like Oakes and the other licensed trainers convicted in this matter – was well-acquainted with the various legal regimes governing the sale and distribution of an adulterated and misbranded drug. Rhein generated false invoices for customers, using misleading billing codes for SGF-1000 and the illicit clenbuterol he provided to racehorse trainers – activity similar in its design and intent to the use of "Northfork" racing to mask Oakes' purchase of horses and drugs.  Unlike

      Oakes, Rhein's offense conduct was limited to a handful of adulterated and misbranded PEDs, whereas Oakes obtained and administered a number of different, and novel, PEDs. On January 5, 2022, this Court sentenced Rhein to a term of three years' imprisonment, and one year of supervised release.

- Jorge Navarro (Guidelines Range of 168 to 210 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence is correspondingly adjusted to 60 months' imprisonment): Navarro, a thoroughbred racehorse trainer, was a prolific doper of racehorses, utilizing multiple sources of supply for the PEDs he used, drawing from foreign and domestic sources, and soliciting drugs from both non-veterinarians and veterinarians alike. Navarro is notable for his aggressive pursuit of novel drugs to administer to the racehorses under his care and control. Like Oakes, as a trainer, Navarro personally profited from the improved performance of the racehorses he had surreptitiously and corruptly doped – but the extent and known duration of Navarro's doping operation merited a higher statutory maximum sentence and, consequently, a higher Guidelines sentence. On December 17, 2021, this Court sentenced Navarro to a term of 60 months' imprisonment, and three years' supervised release.

      The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general and specific deterrence. A Guidelines sentence of 36 months' imprisonment is the appropriate sentence – one sufficient but not greater than necessary to serve the purposes of sentencing when balancing Oakes' acceptance of responsibility, his culpability relative to other defendants, the abuse he exhibited as a licensed racehorse trainer with direct and unconstrained access to racehorses, and use of multiple PEDs and opaque corporate forms to mask his offense.

      A Guidelines sentence is necessary to provide just punishment and reflect the nature and seriousness of the offense given Oakes' apparently casual attitude regarding his offense. As noted, it is not the case that Oakes' crime was the result of a single lapse in judgment, confined in time and scope; nor is it true that Oakes did not engage in animal abuse in pursuit of money. To the contrary, Oakes engaged in repeated and persistent efforts to cheat through the use of various PEDs and sham corporate entities used to disguise his ownership and drug purchases. He extolled others to dope their horses, and provided drugs to his friends in furtherance of their own illegal doping programs. The offense was grave, and a substantial sentence is warranted as a result.

      Further, a Guidelines sentence is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Racehorse trainers, who are entrusted with the care and custody of racehorses, have unfettered access to these animals, and by extension are entrusted to ensure those horses' care and health. Like veterinarians, trainers are afforded a certain latitude under the assumption that they are acting in good faith as competitors and as custodians of racehorses. Oakes exploited that good faith and, when he felt that his name would raise red flags, used a sham company and secret contracts to hide his participation in ownership and doping. Oakes, like all too many actors in the racehorse industry, had grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit. Racehorse trainers, in particular, assume that

even if caught doping, they will have the means and wherewithal to obfuscate, litigate, and intimidate others into overlooking or justifying a violation, and thus continue their doping practices unencumbered. A Guidelines sentence of 36 months' imprisonment will send a strong signal to racehorse trainers and others in the industry that there will be serious consequences if they abuse their position of trust by engaging in the callous and dangerous practice of doping racehorses for profit. A significant sentence will counter the pervasive view in the racehorse industry that administering PEDs is inconsequential and that the consequences of criminal activity will never amount to significant criminal penalties.

## Conclusion

The Government respectfully submits that the stipulated Guidelines sentence of 36 months' imprisonment is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Andrew C. Adams
Sarah Mortazavi
Anden Chow
Assistant United States Attorneys

cc: Page Pate, Esq. (via ECF)